UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | |
|---|---|
| NATAYA BATTLES, § | |
| § | |
| Plaintiff, § | |
| § | |
| VS. § | CIVIL ACTION NO. 1:21-CV-179 |
| § | |
| ISLAMIC REPUBLIC OF IRAN, § | |
| § | |
| Defendant. § | |

## ORDER AND OPINION

In October 2004, Sergeant Michael Battles served on active duty in Iraq with the United States Army. While Sergeant Battles was manning a checkpoint during peacekeeping operations in Baghdad, al Qaeda operatives detonated an improvised explosive device ("IED"), and he was killed by the explosion.

Sergeant Battles's daughter, Nataya, filed this action against the Islamic Republic of Iran under the state-sponsored terrorism exception to the Foreign Sovereign Immunities Act, 28 U.S.C. § 1605A, alleging that Iran is liable for her father's death because of the state's material support of al Qaeda's terrorist activity in Iraq.

After Battles perfected service under the Hague Convention, Iran failed to file a responsive pleading. The Clerk of Court entered default, and Battles subsequently moved for default judgment. (Motion, Doc. 18; Supplemental Brief, Doc. 19) Based on the record and the applicable law, the Court finds that Battles has provided satisfactory evidence to support default judgment.

**I.     Factual Findings[1]**

   **A. Evidentiary Standard**

Federal Rule of Civil Procedure 55 governs the entry of default judgment, which represents a "drastic remedy" available only where "the adversary process has been halted because of an essentially unresponsive party." *Sun Bank of Ocala v. Pelican Homestead and Sav. Ass'n*, 874 F.2d

---

[1] The Court bases its factual findings on the evidence that Battles submitted and of which the Court can take judicial notice.

274, 276 (5th Cir. 1989) (citations omitted). The district court in its discretion determines whether a default judgment is appropriate. *Lindsey v. Prive Corp.*, 161 F.3d 886, 893 (5th Cir. 1998).

Under the Foreign Sovereign Immunities Act ("FSIA"), "[n]o judgment by default shall be entered by a court . . . unless the claimant establishes [her] claim or right to relief by evidence satisfactory to the court." 28 U.S.C. § 1608(e). "[T]he FSIA leaves it to the court to determine precisely how much and what kinds of evidence the plaintiff must provide", and "[u]ncontroverted factual allegations that are supported by admissible evidence are taken as true." *Karcher v. Islamic Republic of Iran*, 396 F. Supp. 3d 12, 21 (D.D.C. 2019) (quoting *Han Kim v. Democratic People's Republic of Korea*, 774 F.3d 1044, 1047 (D.C. Cir. 2014)); *see also Wooten v. McDonald Transit Assocs., Inc.*, 788 F.3d 490, 496 (5th Cir. 2015) (citations omitted) ("A default judgment is unassailable on the merits but only so far as it is supported by well-pleaded allegations, assumed to be true.").[2] A court may not "simply accept a complaint's unsupported allegations as true"; the plaintiff must provide some form of evidentiary support. *Roth v. Islamic Republic of Iran*, 78 F. Supp. 3d 379, 386 (D.D.C. 2015) (citations omitted). Plaintiffs may satisfy their burden of production through the submission of documentary evidence, such as detailed affidavits or declarations describing the nature and extent of their damages. *Id.* (accepting uncontroverted evidence in the form of affidavits as true); *Estate of Doe v. Islamic Republic of Iran*, 808 F. Supp. 2d 1, 7 (D.D.C. 2011). Additionally, a court can "review evidence considered in an opinion that is judicially noticed, without necessitating the re-presentment of such evidence", although the court must "reach [its] own, independent findings of fact." *See Rimkus v. Islamic Republic of Iran*, 750 F. Supp. 2d 163, 172 (D.D.C. 2010) (quoting *Murphy v. Islamic Republic of Iran*, 740 F. Supp. 2d 51, 58–59 (D.D.C. 2010)).

---

[2] The Fifth Circuit does not appear to have considered a matter under the state-sponsored-terrorism exception within the FSIA. The absence of such caselaw stems, at least in part, from the venue provision within 28 U.S.C. § 1391(f) for actions against foreign states. Under that provision, most lawsuits under Section 1605A would typically fall within Section 1391(f)(4), which provides for venue in the United States District Court for the District of Columbia. Accordingly, that judicial district provides most of the caselaw regarding the state-sponsored terrorism exception. But Section 1391(f) is permissive and not exclusive—i.e., a state action "may be brought" in four defined venues—and here, venue is proper in the Southern District of Texas, Brownsville Division. Given the absence of Fifth Circuit authority on this issue, the Court looks to the decisions from the District of Columbia as persuasive authority.

In the current matter, Battles submitted ten exhibits with her Motion, including two United States Department of State annual reports from 2010 and 2019, news articles detailing Iran's connection to al Qaeda's terrorist operations, a brief by United Against Nuclear Iran, and her declaration. Battles also submitted a Supplemental Brief with seven additional exhibits, including six expert reports from *Karcher* and one report by the American Enterprise Institute. (Doc. 19)

### B. Iran's Support of Terrorism in Iraq

Since 1984, the United States Department of State has designated Iran as a state sponsor of terrorism. (State Dep't Country Reports on Terrorism 2010, Doc. 18-3, 3) The State Department labels Iran as "the world's worst state sponsor of terrorism", based on the Iranian regime's extensive support of various terrorist organizations, including al Qaeda, that are hostile to the United States and its allies. (State Dep't Country Report on Terrorism 2019, Doc. 18-1, 4) The United States has confirmed that the Iranian Ministry of Intelligence and Security ("MOIS") "provided money and weapons to [al Qaeda] in Iraq", as well as facilitated the organization's operations in Iraq through the provision of travel documents. (United Against Nuclear Iran Brief, Doc. 18-5, 11) Iran's material support of al Qaeda's operations in Iraq reaches back to the early 1990's, well before the attack on Sergeant Battles in 2004. (*Id.* at 14)

After the United States invaded Afghanistan in 2001, Iran provided "safe haven" to several al Qaeda leaders and prominent extremists, including Abu Musab Al-Zarqawi, a Jordanian-born Sunni extremist who "initially operated under the protection of the IRGC and its elite Quds Brigade." (*Id.* at 10) "According to intelligence officials, the time Zarqawi spent in Iran was crucial for rebuilding his network before relocating to Iraq." (*Id.*) In 2003, Zarqawi became a leader of Sunni extremists and insurgent groups in Iraq, which he consolidated with his pre-existing terrorist group—Jama'at al-Tawhid wal-Jihad (the Organization of Monotheism and Jihad). (Leo Bradley Report, Doc. 19-3, 9) In October 2004—around the same time that Sergeant Battles was killed—Zarqawi swore allegiance to Osama Bin-Laden and renamed his organization Tanzim Qaidat al-Jihad fi Bilad al-Rafidayn—commonly referred to as al Qaeda in Iraq (AQI). (*Id.*)

"[AQI] presented a very serious threat to the post-2003 stability of Iraq", and combatting AQI attacks was a focus for United States military in the early years of the Iraqi invasion. (Russell McIntyre Report, Doc. 19-7, 14) According to counter-terrorism expert Donald Barker, at the time, "the majority of the attacks against U.S. forces came from members of the Iraqi minority Sunni community and [AQI] in particular." (Donald Barker Report, Doc. 19-4, 12; *see also* Kevin Lutz Report, Doc. 19-2, 5) These attacks were referred to as the "insurgency." (Donald Barker Report, Doc. 19-4, 13; *see also* Kevin Lutz Report, Doc. 19-2, 5) Sunni groups and AQI focused their activity in western and northern Iraq and Baghdad. (Michael Oates Report, Doc. 19-5, 10)

In their attacks, insurgents typically used improvised explosive devices (IEDs) and explosively formed penetrators (EFPs). (*Id.* at 18–19) An IED is "extremely effective in sowing chaos", as it is a highly adaptable and relatively inexpensive type of weapon. (Leo Bradley Report, Doc. 19-3, 6) For those reasons, terrorist groups were able to utilize IEDs to cause thousands of deaths to United States military and civilians in the Iraqi region during the 2000s. (*Id.*) IEDs posed a growing threat to the United States military in Iraq, and the threat became so prevalent that in 2003, the military established an IED Task Force to counter the "rapidly expanding IED threat" in Iraq. (Kevin Lutz Report, Doc. 19-2, 4) The lethal threat posed by IEDs and EFPs also prompted the U.S military to add additional armoring to its vehicles. (Kevin Lutz Report, Doc. 19-2, 14, 23)

Weapons specialists from the United States military have traced the machinery used to manufacture weapons used by AQI to Iran and its illicit supply chain. (Michael Oates Report, Doc. 19-5, 26) Iran was providing terror cells in Iraq with the "capacity to build IEDs", both by funding the manufacture of these weapons and by helping to smuggle their components into Iraq, with the express intended purpose of attacking United States servicemembers and further destabilizing the Iraqi region. (Kevin Lutz Report, Doc. 19-2, 10; Leo Bradley Report, Doc. 19-3, 25; AEI Brief, Doc. 19-8, 22)

By "no later than early February [2004], a supply of arms flowed from Iran into al Qaeda strongholds" in Iraq, and "Iranian arms became an important part of al Qaeda's arsenal". (AEI Brief, Doc. 19-8, 22–23) "Some of AQI's trademark attacks included suicide bombings, house bombings—and the previously mentioned [vehicle-borne IED] attacks." (Michael Oates Report, PX 16, Doc. 21-5, 10) In the early 2000s, evidence suggested that Zarqawi was dispatching numerous suicide bombers throughout Iraq to orchestrate attacks with IED bombs, and that these kinds of weapons were being used in terrain controlled by AQI, not the Shiite militias. (AEI Brief, Doc. 19-8, 23; Mot. for Default Judgment, Doc. 18, 12)

### C. The Attack on Michael Battles

On October 28, 2004, Michael Battles, a Sergeant 1st Class in the United States Army, was manning a checkpoint in Baghdad, Iraq. (Compl., Doc. 1, 1) A terrorist driving by the checkpoint on a motorcycle threw and detonated an IED, killing Sergeant Battles. (*Id.*) The evidence does not indicate whether there was an official investigation into the identity of the operatives that orchestrated the attack or if others were killed in the attack.

### D. Procedural History

Plaintiff Nataya Battles is the surviving daughter and biological child of Sergeant Battles. (Compl., Doc. 1, 22) She seeks compensatory damages for loss of solatium, pain and suffering, economic and loss of income, loss of consortium, and severe emotional distress and mental anguish, as well as punitive damages. (*Id.* at 23)

Battles perfected service on Iran under 28 U.S.C. § 1608(a)(3). In March 2022, the Clerk of Court entered default. (Entry of Default, Doc. 13) Battles now moves for default judgment. (Motion, Doc. 18)

## II. Analysis

In general, a foreign state is immune from a lawsuit for money damages in a United States federal court. *Blais v. Islamic Republic of Iran*, 459 F. Supp. 3d 40, 53 (D.D.C. 2006). The Foreign Sovereign Immunities Act, however, contains an exception for state-sponsored terrorism. This

5

exception permits plaintiffs to sue a foreign state for damages caused by "an act of torture, extrajudicial killing . . . or the provision of material resources for such an act if such act or provision of material or resources is engaged in by an official, employee, or agent of such foreign state while acting within the scope of his or her office, employment, or agency." 28 U.S.C. § 1605A.

A prima facie case under the state-sponsored-terrorism exception to the FSIA requires the plaintiff to demonstrate that:

1) the foreign state defendant is designated as a state sponsor of terrorism when the original action was filed;

2) the claimant is a national of the United States;

3) the damages were caused by an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources for a terrorist attack;

4) the act(s) are engaged in by an official, employee, or agent of the foreign state;

5) while acting within the scope of the office, employment, or agency.

*Id.*

Material support or resources refers to "any property, tangible or intangible, or service, including currency or monetary instruments or financial securities, financial services, lodging, training, expert advice or assistance, safehouses, false documentation or identification . . . weapons, lethal substances, [and] explosives". 18 U.S.C. § 2339A(b)(1); § 1605A(h)(3). "[W]here a foreign state routinely funnels money to a terrorist organization, a plaintiff need not establish that the material support or resources provided by a foreign state for a terrorist act contributed directly to the act from which the claim arises to satisfy his obligation under the statute." *Rimkus*, 750 F. Supp. 2d at 182 (cleaned up); *see Valore v. Islamic Republic or Iran*, 700 F. Supp. 2d 52, 66 (D.D.C. 2010) ("[T]here is no but for causation requirement for claims made under the FSIA.") (cleaned up). In other words, the plaintiff only needs to show that "a particular terrorist group committed the terrorist act", and that the foreign state generally sponsored that group such that the state "contributed to the group's ability to carry out the terrorist attack." *Kilburn v. Islamic Republic of Iran,* 699 F. Supp. 2d 136, 153 (D.D.C. 2010).

**A. Liability**

Based on the applicable law and the evidence presented with the Motion and Supplemental Brief, the Court concludes that Battles has provided satisfactory evidence to establish a prima facie case under Section 1605A to support a default judgment.

The evidence easily satisfies the initial three elements. First, since 1984, the United States has designated Iran as a state sponsor of terrorism. Second, Battles enjoys United States citizenship. Third, the alleged damages arise from a terrorist attack that resulted in an extrajudicial killing. The FSIA adheres to the definition of "extrajudicial killing" set forth in the Torture Victims Protection Act of 1991: a "deliberated killing, not authorized by a previous judgment pronounced by a regularly constituted court, affording all judicial guarantees which are recognized as indispensable by civilized peoples." *Rimkus*, 750 F. Supp. 2d at 182; *see* 28 U.S.C. § 1605A(h)(7); 28 U.S.C. § 1350. This definition readily encompasses the attack on Sergeant Battles.

Battles's Motion turns then, on whether she has established the fourth and fifth elements—i.e., does the evidence demonstrate a clear causal connection between Iran's state action and the terrorist attack that killed Sergeant Battles? The Court finds that Battles has demonstrated such causation.

The attack on Sergeant Battles involved an IED, which counter-terrorism and weapons experts agree was a kind of weapon that AQI consistently used to carry out suicide bombings and attacks on United States servicemembers in Iraq, specifically in Baghdad, where Sergeant Battles was manning the military checkpoint. (Michael Oates Report, PX 16, Doc. 21-5, 10) The reports also demonstrate that vehicle-borne IED attacks, such as the attack at the checkpoint which Sergeant Battles manned, were an AQI "trademark". (*Id.*; Compl., Doc. 1, 19)

By 2004, there was such a volume of IEDs in Iraq that the United States was working to collect intelligent on where the IED components were being smuggled from in order to better understand the threat. (Leo Bradley Report, Doc. 19-3, 14) The evidence demonstrates that Iran provided material support specifically to AQI. The United States and the United Nations have

7

identified a long-standing partnership between Iran and al Qaeda that included harboring Zarqawi and other AQI operatives in a "safe haven", as well as providing funds, training, and weapons to al Qaeda operatives in various middle eastern countries, including Iraq. (United Against Nuclear Iran Brief, Doc. 18-5; AEI Brief, Doc. 19-8, 13–36)  At the time of the IED attack that killed Sergeant Battles, intelligence experts had determined that Iran was responsible for a significant portion of AQI's weapons arsenal, including the components used to construct IEDs. (AEI Brief, Doc. 19-8, 23)

Iran was motivated to facilitate AQI's attacks on United States servicemembers because "[AQI] extremists continue[d] to act as accelerants for ethno-sectarian violence," and "became a critical tool of Iranian foreign policy in its goals for regional dominance." (*Id.* at 17)  AQI's use of smuggled Iranian IED and EFP components was a mutually beneficial arrangement, as AQI required the assistance of more-sophisticated suppliers, and Iran needed the insurgent groups to further destabilize the Iraqi region and broaden its geopolitical influence. (Michael Pregent Report, Doc. 19-6, 16; Leo Bradley Report, Doc. 19-3, 25; AEI Brief, Doc. 19-8, 22)  By the early 2000s, "a supply of arms flowed from Iran into al Qaeda strongholds" in Iraq, and "Iranian arms became an important part of al Qaeda's arsenal". (AEI Brief, Doc. 19-8, 22–23)

Armed by Iran, AQI consistently carried out attacks against United States servicemembers in Iraq. (Michael Oates Report, Doc. 19-5, 10)  It is true that no terrorist group claimed responsibility for the attack that killed Sergeant Battles, and no investigation found definitive, direct evidence of AQI's involvement.  The location of the attack and weapon used, however, renders almost a certainty that Iran either directly supplied the weapon or indirectly provided the resources necessary to orchestrate the attack, and the evidentiary record establishes that AQI had the capacity to conduct regular attacks in this region because of Iran's material support. As a result, the Court concludes that the evidence is satisfactory to demonstrate that Iran, through various state officials and agents, contributed significantly to AQI's ability to orchestrate the IED attack that killed Sergeant Battles in Baghdad in October 2004.

8

**B. Damages**

Nataya Battles states that the attack caused "the decedent and [herself] severe injury, including: pain and suffering; economic damages and loss of income; loss of guidance, companionship and society; loss of consortium; severe emotional distress and mental anguish; and loss of solatium." (Compl., Doc. 1, 23)[3] She requests compensatory damages of $15 million, as well as punitive damages to punish the Defendant for its support of terrorism in Iraq.[4] (Motion, Doc. 18, 32)

Section 1605A(c) provides that victims of state-sponsored terrorism may recover money damages, including "economic damages, solatium, pain and suffering, and punitive damages." *Braun v. Islamic Republic of Iran*, 228 F. Supp. 3d 64, 82 (D.D.C. 2017). "To obtain compensatory damages in an FSIA case, a plaintiff 'must prove that the consequences of the defendants' acts were reasonably certain to occur, and they must prove the amount of damages by a reasonable estimate.'" *Moradi v. Islamic Republic of Iran*, 77 F. Supp. 3d 57, 69 (D.D.C. 2015) (quoting *Reed v. Islamic Republic of Iran*, 845 F. Supp. 2d 204, 213 (D.D.C. 2012)).

Applying this analysis to the present case, the Court initially finds, for the reasons previously articulated in Part II.A, that Battles has satisfactorily shown that Iran's material support of AQI had the reasonably certain and intended consequence of causing the attack and killing of Sergeant Battles. To determine a reasonable estimate of the resulting harm, the Court relies on Battles's declaration and prior awards for comparable injuries in other FSIA cases.

---

[3] Battles does not elaborate on her claim for pain and suffering damages. The FSIA permits an award for pain and suffering to victims who survived a terrorist act, based on the "severity of the pain immediately following the injury, the length of hospitalization, and the extent of the impairment that will remain with the victim for the rest of his or her life." *Valore*, 700 F. Supp. 84 (D.D.C. 2010) (internal quotation omitted); *see Braun*, 227 F. Supp. 3d at 83 (awarding the claimant survival damages for the pain and suffering the victim experienced during the two-hour period after the terrorist attack and before her death). In the present matter, Battles does not raise a survival claim on behalf of her father or allege that her father survived for any quantifiable period of time after the missile strike. The Court finds that no allegations in Battles's Complaint support an award for pain and suffering.

[4] In her Complaint, Battles requests at least $40 million in compensatory damages. (Doc. 1, 33) In her Motion for Default Judgment, she requests the Court follow the Texas State Court decision of *Cargal v. FedEx Freight*, in which the jury awarded each individual plaintiff a total of $15 million in compensatory damages. (Doc. 18, 32)

1. **Solatium Damages**

"A claim for solatium seeks compensation for the mental anguish, bereavement and grief that those with a close personal relationship to a decedent experience as a result of the decedent's death, as well as the harm caused by the loss of the decedent, society, and comfort." *Braun*, 228 F. Supp. 3d at 84 (citations omitted); *see* BLACK'S LAW DICTIONARY (11th ed. 2019) (defining solatium damages as those that compensate for "hurt feelings or grief, as distinguished from damages for physical injury"). Family members of individuals who survive a terrorist attack may also recover such damages. *See, e.g., Valore*, 700 F. Supp. 2d at 85. As solatium damages are "by their very nature unquantifiable," courts have relied on the framework set forth in *Estate of Heiser v. Islamic Republic of Iran* as a standardized approach when awarding solatium damages in FSIA cases. 466 F. Supp. 2d 229, 269 (D.D.C. 2006); *see, e.g., Braun*, 228 F. Supp. 3d at 85; *Moradi*, 77 F. Supp. 3d at 72; *Roth*, 78 F. Supp. 3d at 403 (applying the *Heiser* damages framework for solatium damages in FSIA cases).[5] Under the *Heiser* framework, "[r]elatives of surviving servicemen receive[ ] awards valued at half of the awards to family members of the deceased: $4 million for spouses, $2.5 million for parents, and $1.25 million for siblings." *Valore*, 700 F. Supp. 2d at 85.

Courts increase the baseline solatium damages based on evidence of a particularly-close relationship between the claimant and the victim, medical proof of severe grief, or circumstances surrounding the attack that may have increased the plaintiff's suffering. *Braun*, 228 F. Supp. 3d at 85 (finding that the parents' presence at the scene of the attack supported a finding of "heightened anguish" and a 25% enhancement of the *Heiser* baseline); *see also Oveissi*, 768 F. Supp. 2d at 27–29 (applying a 50% enhancement of the *Heiser* baseline based on the close familial relationship between the plaintiff-grandchild and the deceased grandparent, and evidence of the disturbing nature of the killing that demonstrated a heightened level of suffering). On the other hand, courts depart downward from the baseline amount when no evidence demonstrates a close relationship

---

[5] Courts have also found that FSIA solatium claims are "indistinguishable from the [tort of] intentional infliction of emotional distress". *Wagner v. Islamic Republic of Iran*, 172 F. Supp. 2d 128, 135 n.11 (D.D.C. 2001); *see Roth*, 78 F. Supp. 3d at 403 ("Solatium under the FSIA is functionally identical to IIED.").

between the claimant-relative and the victim.  *See Valore*, 700 F. Supp. 2d at 87 (departing downward by 50% where the relationship between the victim and his brother was "fairly attenuated").

In the present case, the Court finds that the evidentiary record supports the baseline award of $5 million.  Battles's declaration establishes that in the eighteen years since and as a result of Sergeant Battles's death, she has suffered and will continue to suffer severe emotional distress and mental anguish. (Battles Decl., Doc. 18-10, 2)  Her declaration does not demonstrate that she and her father shared a particularly-close relationship, however, they did exchange calls while her father was deployed in Iraq, and she was hopeful that she would establish a closer relationship with her father when he was discharged from the military.  (*Id.*)  All hope of further developing her relationship with her father was taken from her when her father was killed.  Her declaration also shows that after her father's death, Battles sought medical treatment for depression, and only stopped receiving treatment when her father's medical benefits expired. (*Id.*)  She affies that she continues to grieve the loss of her father and suffer from depression and post-traumatic stress disorder in the present day.  (*Id.*)

In light of the harm that Battles has suffered as a result of her father's death, the Court awards $5 million in solatium damages.

    **a. Economic Loss**

Battles also requests economic and loss of income damages.  Plaintiffs seeking such damages must "support the claim [ ] with competent evidence" demonstrating that the incident in question proximately caused the economic loss.  *Moradi*, 77 F. Supp. 3d at 71; *see also Oveissi v. Islamic Republic of Iran*, 768 F. Supp. 2d 16, 31 (D.D.C. 2011).  "Unlike damages for pain and suffering, lost earnings are not hard to quantify, and the Court will not excuse plaintiffs' failure to support the claim for lost earnings with competent evidence."  *Oveissi*, 768 F. Supp. 2d at 31; *see*

11

*also Braun*, 228 F. Supp. 3d at 83 (declining to award economic damages to plaintiffs who submitted insufficient evidence).

In support of her claim for economic loss, Battles affies her father "faithfully paid child support," and that "the loss of his income and financial support has damaged [her family] greatly." (Battles Decl., Doc. 18-10, 2–3)  But she presents no information regarding her father's salary at the time of the accident, or his anticipated earning capacity had he not been killed, depriving the Court of any basis on which to calculate the loss of Sergeant Battles's future earnings.  Accordingly, the Court has an insufficient basis on which to calculate the economic loss attributable to the defendant's conduct.

Battles also submits a judgment from a Texas state court.  (*Cargal v. Fedex Freight, Inc., et al.*, Final Judgment, Doc. 18-9)  As with her Declaration, this evidence provides no foundation on which to calculate damages for loss of income.  In contrast to solatium damages, economic losses typically represent calculable damages, dependent upon the particular circumstances of each case. The facts that underpin an economic damages award in one matter do not automatically apply in another context.  Battles not only fails to submit evidence detailing her father's salary and lost earning capacity, she also submits no information about the facts on which the jury awarded damages in *Cargal*, preventing any analysis as to whether that case presents an analogous or distinguishable matter.

Due to the absence of satisfactory evidence, the Court awards no economic loss damages.

### 2. Punitive Damages

"Punitive damages are not meant to compensate the victim, but instead meant to award the victim an amount of money that will punish outrageous behavior and deter such outrageous conduct in the future." *Oveissi v. Islamic Republic of Iran*, 879 F. Supp. 2d 44, 56 (D.D.C.2012). In FSIA cases, courts typically have determined whether punitive damages are appropriate based on four factors: "(1) the character of the defendants' act, (2) the nature and extent of harm to the plaintiffs that the defendants caused or intended to cause, (3) the need for deterrence, and (4) the

wealth of the defendants." *Acosta v. The Islamic Republic of Iran*, 574 F. Supp. 2d 15, 30 (D.D.C. 2008).  Where the plaintiff has established that a foreign state has provided material support to a terrorist organization, these four factors strongly favor awarding punitive damages.  *See, e.g., Braun*, 228 F. Supp. 3d at 86.  For example, in *Oveissi,* the court awarded punitive damages based on its finding that Iran provided funding and resources to Hezbollah and MOIS to carry out a "horrific assassination".  879 F. Supp 2d at 55.  As to the first and second factors, the court emphasized that "[t]he nature of the defendants' act and the nature and extent of the harm defendants intentionally caused are among the most heinous the Court can fathom." *Id*. at 56. Regarding the third and fourth factors, the court found that "Iran is a foreign state with substantial wealth and has expended significant resources sponsoring terrorism," supporting the award of $300 million in punitive damages to dissuade Iran from further sponsorship of terrorists.  *Id*. at 57.

Courts have taken at least three distinct approaches to determine the amount of a punitive-damages award under the FSIA.  First, several courts have estimated a foreign state's "annual expenditure on terrorism" and multiplied that figure by a factor between three and five.  *See Acosta*, 57 F. Supp. 2d at 31 (estimating Iran's annual expenditure on terrorism at between $50 and $150 million, and awarding $300 million in punitive damages); *Roth*, 78 F. Supp. 3d at 406 (applying a multiplier of three to an estimated annual expenditure of $37.5 million to award $112.5 million in punitive damages).  At the same time, under this approach, some courts have declined to multiply the estimated annual expenditures when the resulting amount would have exceeded $300 million.  *See Oveissi*, 879 F. Supp. 2d at 56–57 (reasoning that a $300 million punitive-damages award was consistent with similar FSIA cases); *Baker v. Socialist People's Libyan Arab Jamahirya*, 775 F. Supp. 2d 48, 85 (D.D.C. 2011) ("[W]ith one exception, [this court has] never awarded an amount higher than $300 million in punitive damages against Iran.").

Other courts have awarded "punitive damages in an amount equal to the total compensatory damages awarded".  *Moradi*, 77 F. Supp. 3d at 73 (awarding $10.168 million in compensatory

13

damages, and the same amount as punitive damages); *see also Onsongo v. Republic of Sudan*, 60 F. Supp. 3d 144, 153 (D.D.C. 2014) (subsequent history omitted) (apportioning punitive damages among the plaintiffs according to their compensatory damages). The *Moradi* court distinguished the cases that applied a multiplier calculation by explaining that the case before it concerned actions taken directly by Iranian authorities, and noted that the victim had survived the attack. 77 F. Supp. 3d at 73.

Finally, other courts have awarded a fixed amount of $150 million in punitive damages per affected family. *See Braun*, 228 F. Supp. 3d at 87 (concerning Iran's material support of Hamas, which in turn orchestrated a terrorist attack in Jerusalem by driving a car into a crowd of pedestrians); *Gates v. Syrian Arab Republic*, 580 F. Supp. 2d 53, 75 (D.D.C. 2008) (involving Syria's material support of AQI, which released a graphic video of the gruesome decapitation of two American citizens).

In the present matter, the Court finds that punitive damages should be awarded to further the goal of punishing Iran for its reprehensible support of AQI, and to deter it and other foreign sovereigns from supporting terrorist organizations in the future. The evidentiary record demonstrates that Iran's support of AQI foreseeably led to indiscriminate acts of violence and murder in Iraq, including the that attack that killed Sergeant Michael Battles. Iran poured extensive resources into manufacturing IEDs and EFPs and utilizing its smuggling networks to deliver weapons to terrorist organizations that were best positioned to launch an attack against United States military and Iraqi civilians. Iran's support enabled AQI to plan such an attack, and provided the equipment and other resources necessary for AQI to implement the assault. The Court finds that an award of punitive damages is appropriate and necessary to punish Iran for its conduct and to deter it from similar future behavior.

Turning to the appropriate amount of punitive damages, the Court first notes that the evidentiary record contains no data regarding Iran's annual expenditures in support of terrorism, or of its wealth. Decisions from other cases involving Iran provide a range of punitive damages

previously imposed against that country, but those cases generally involved more robust evidentiary records. The Court recognizes that punitive damages, meant to punish and deter the defendant, should typically turn in large part on the particular defendant's wealth, so as to provide a meaningful deterrent. But in the current matter, such a measure proves difficult, if not impossible. As a result, the Court will base the award of punitive damages on its award of compensatory damages, but with a five-fold multiplier to increase the deterrent impact. Based on this approach, the Court awards $25 million in punitive damages to Battles.[6]

## III. Conclusion

For the reasons previously explained, it is:

**ORDERED** that Plaintiff Nataya Battles's Motion for Default Judgment (Doc. 18) is **GRANTED IN PART AND DENIED IN PART** as explained in this Order and Opinion; and

**ORDERED** that by no later than September 2, 2022, Plaintiff Nataya Battles submits a motion for attorney's fees, identifying the statutory or other basis for the recovery of such fees, as well as any necessary evidence to support the requested amount of attorney's fees, and for the award of pre- and post-judgment interest.

Upon the filing of the motion related to attorney's fees and pre- and post-judgment interest, the Court will issue a Final Default Judgment in accordance with this Order and Opinion.

It is also **ORDERED** that Plaintiffs serve a copy of this Order and Opinion on Defendant Islamic Republic of Iran consistent with the requirements of 28 U.S.C. § 1608(e).

Signed on August 17, 2022.

_____
Fernando Rodriguez, Jr.
United States District Judge

---

[6] This award is also consistent with the Supreme Court's guidance that when reviewing a punitive damages award, due process warrants the consideration of, among various factors, the disparity between the compensatory and punitive damage awards. *See BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 575 (1996).